# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

**LYNN C. LAURIE**,

        Plaintiff,

    v.

**UNITED OF OMAHA LIFE INSURANCE COMPANY**,

        Defendant.

Case No. 3:14-CV-01937-YY

**FINDINGS AND RECOMMENDATIONS**

YOU, Magistrate Judge:

## INTRODUCTION

Plaintiff, Lynn C. Laurie ("Laurie"), is a Certified Public Accountant ("CPA") at the accounting firm Delap, LLP ("Delap"), and was a participant in an employee benefits plan ("Plan") sponsored by Delap that offered long-term ("LTD") and short-term ("STD") disability benefits to eligible employees. Laurie filed this action on December 4, 2014, alleging the Plan administrator, United of Omaha Life Insurance Company ("United"), violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), by denying her claims for STD and LTD benefits. This court has jurisdiction over this action under 28 U.S.C. §§ 1331 & 1132(e)(1). Laurie seeks declaratory relief under 29 U.S.C. § 1132(a)(3)(B) in the form of a judgment finding: (1) she was entitled to receive eleven weeks of STD benefits from United in May, June, July, and August 2012; (2) she has been entitled to receive LTD benefits from United since August 2012; and (3) she will be entitled to continue to receive monthly LTD benefits from United until she reaches age 67, as long as she continues to remain "Disabled" under the terms of the United LTD policy. Complaint, ECF #1 ¶ 32.

Based on a stipulated record (ECF #33), the parties have filed cross-motions for summary judgment pursuant to FRCP 56.  Because United's decision to deny Laurie both STD benefits and LTD benefits was an abuse of discretion, Laurie's Motion (ECF #34) should be granted, and United's Motion (ECF #36) should be denied.

## FACTUAL BACKGROUND

### I.    Relevant Medical History

In 2003, Laurie suffered from a bought of extreme fatigue that forced her to miss work for the next three weeks, where she slept for 15 to 18 hours per day.  AR 745, 1051.[1]  Over the next 10 months, Laurie was examined by at least 18 different physicians and other medical providers in attempts to determine the source of what she described—and what her physicians reported as—"profound," "extreme," and "overwhelming" fatigue.  AR 467–470, 1003, 1014, 1019, 1051.  Because it was suspected that Laurie suffered from Chronic Fatigue Syndrome ("CFS"), she was eventually referred to rheumatologist Howard Ghandler, M.D.  AR 1014–15.  Laurie's symptoms continued, and in June 2004, with Dr. Ghandler's referral, she sought treatment at the Mayo Clinic.  AR 1022–56.  Steve Krotzer, M.D., conducted a series of diagnostic tests, and after excluding many other potential conditions, diagnosed Laurie with CFS.  AR 1023–24.  Dr. Krotzer prescribed several conservative treatments, including increasing salt intake, avoiding sitting or standing for long periods of time, maintaining good nutrition and sleep, and practicing a modest exercise program.  AR 1023, 1052.  Following these recommendations—and with the regular input of her treating physician, Thomas Kasten, M.D.— Laurie managed her CFS symptoms for the next eight years.  AR 1058–72.

---

[1]  Citations to "AR" are to the last four digits of the Administrative Record (ECF #33), beginning with "United-000".

However, on May 7, 2012, following that year's tax season, Laurie suffered an extreme exacerbation of her CFS symptoms, commonly referred to as a "CFS crash." AR 1073. On May 17, 2012, Dr. Kasten described Laurie's condition following the CFS crash as follows:

> Trying to carry on with her routine. She did not see the fatigue coming. There was no preceding expenditure of energy that led to this. Felt drugged when she awoke on the 7th. Slept until 2 PM. Was awake for 4 hours and then went to sleep again at night. Still has continued to have severe sleep need. Fatigue is often just physical but feels mental fatigue as well. Feels lightheaded.

AR 1073. Dr. Kasten noted that Laurie additionally suffered from non-fatigue symptoms including hot flashes and headaches. His chart notes indicate that she was "well appearing, comfortable appearing, non-ill appearing, pleasant, [well-nourished] and hydrated," and of "normal mood, affect, speech, [and] thoughts." AR 1073–74.

During a follow-up appointment on June 18, 2012, Laurie reported that she had only worked eight days since the event. AR 0070 (working 45 hours in May 2012); AR 1143 (working 55 hours in June 2012). She reported continued fatigue: "Not strong enough to sing in church. Is exhausted by the time she gets out of the shower but not enough energy left to go to work. Tries to walk around the block once to three times a day to keep moving. Sometimes she cannot make it around the block." AR 1076–77. Dr. Kasten noted that Laurie had "never got[ten] a full neuro or psychiatric evaluation." AR 1076.

Dr. Kasten ultimately prescribed a medical leave of absence: "[n]ew worsened fatigue has [disabled] her [beyond] capability of continuing work. I recommend she take [a leave] of absence due to disability." AR 1077. Laurie took a medical leave of absence from work in 2012 from late June through August—a total of eleven weeks. AR 1076.

Laurie met with Dr. Kasten again on July 24, 2012. Laurie had started counseling, and found it to be helpful in a way that all "her very plentiful support system of friends and family

does not cover." AR 0170–71. Dr. Kasten found that Laurie's CFS was currently "more disabling than it has been in recent years." AR 0171. However, "[s]ignificant stressors at work are being reduced and that bodes well for her eventual success[.]" *Id.* She would be able to return to part-time work but was "not ready yet." *Id.*

Between July and November 2012, Laurie underwent a sleep study with Dr. Daniel Root and his colleagues to determine if a sleep disorder was contributing to her symptoms. AR 1230–52. While Dr. Root found that Laurie suffered from periodic limb movements, arousals, alpha intrusion, and reduced slow-wave and REM sleep, he concluded "[s]leep is not likely the primary driver of her fatigue." AR 1251.

Throughout her medical leave, Laurie continued to experience fatigue. On August 30, 2012, Laurie told Dr. Kasten that after 1.5 hours of sitting at the computer doing basic bookkeeping work for her husband, she "mostly need[ed] to be lying down for the entire following day." AR 0204. Laurie reported progress in her ability to stand and sing at church but no improvement in her morning energy levels, making it hard for her to get out of bed at 7 a.m. and leaving her feeling poorly until 10 a.m. *Id.*

When she returned to work part time at Delap, she continued to be fatigued even by her reduced work schedule. In November 2012, she reported to Dr. Kasten that after working three hours per day on three different days over a two-week period, she experienced migraine headaches for the first time in several months. AR 0206. She also had arm heaviness and a racing heart after showers. *Id.* When she was not working, she was lying on her back with her feet up. *Id.*

On January 6, 2013, Laurie described to Dr. Kasten the effects of working more than 2.5 hours: "She worked 2.5 hours this past Monday at home. Then went to office to finish collating

attachments, was up, driving and finished her work goals[.]"  AR 0208.  Afterward, she "could

not do anything the next two days."  *Id*.  She "[h]ad to lie in bed for the most part over the next

two days."  *Id*.

After working 4.5 hours in early March 2013, Laurie crashed the next day: "[s]he got up

to eat a []little breakfast but was in bed the remainder of the time yester[day] until getting up."

AR 0180.  A five-hour day several weeks beforehand also forced her to take the next day off in

bed.  *Id*.  However, Laurie observed that the time it took for her to recover from her crashes had

decreased.  *Id*.

By April 18, 2013, Laurie reported improvement in her morning energy levels.  AR

1136–37.  She told Dr. Kasten that she was able to "get functional earlier in the day," waking at

7 a.m. daily, and performing stretches in bed.  AR 1136.  She was able to begin work earlier,

starting at 9 a.m. instead of 10:30 or 11 a.m.  *Id.*  She preferred working from home so she did

not waste energy by commuting and could rest when needed.  *Id.*  However, Laurie continued to

crash for two days if she worked more than four hours on a previous day.  *Id.*  Dr. Kasten opined

that, given her slow but steady improvement, her goal of "working 3 out of 6 days in the office

for 4 hours [was] a reasonable goal."  AR 1137.

On October 21, 2013, Laurie reported to Dr. Kasten that she had been able to get into the

office two days per week in the past month.  AR 1150.  She was working an average of 3.5 hours

each day she went into the office and her stamina was improving.  *Id.*  However, after a bad

night's sleep, she was exhausted after merely showering and did not have enough energy to

work.  *Id.*  Dr. Kasten recommended a continual gradual increase in work hours as tolerated.  *Id.*

He noted Laurie was "constantly balancing exertion level with [the] need for immobility and

rest" and that she "appears to be trying her best to walk this line between increase work hardening and flaring fatigue." *Id.*

## II.  <u>Work Duties and Schedule</u>

Laurie has worked at Delap since 1998.  AR 1378.  She relinquished her partnership position at Delap after she began experiencing CFS symptoms in 2003.  AR 1076, 1378.  With Delap's accommodations, however, Laurie has continued to work as a Tax Principal: an employee with reduced hours, but with significant responsibilities.

At the times Laurie filed for STD and LTD benefits, she was responsible for: serving as primary client contact for tax engagement teams; developing successful client relationships; overseeing project teams; planning engagements; budgeting and managing time; directing and supervising tax-services staff; monitoring and ensuring timely completion of client engagements; rectifying tax and accounting issues; reviewing tax engagements to ensure completeness and accuracy; complying with Delap's policies, procedures, and quality controls; conducting research and making recommendations to senior management; acting as a mentor and instructor; preparing accounting curriculum for new employees; and other duties as assigned.  AR 0066–67. Laurie's position also required that she develop: leadership skills to guide the tax and accounting department; have strong organizational and project management skills; an aptitude for strategic planning with entrepreneurial and visionary mentality; emerging business development skills; strong client-relationship-management and interpersonal skills; excellent written and oral communication skills, creative problem-solving skills, and strong analytical skills; the ability to schedule time and workload to simultaneously conduct multiple engagements in an efficient manner, delegating to accounting staff when needed; the ability to lead and work effectively as part of a team yet function well with independent responsibilities; an excellent working

knowledge of a multitude of tax and accounting software and technology resources; a strong

knowledge and understanding of accounting, tax, and related business trends; the ability to

successfully interact in Delap's culture of integrity; and be involved in the community through

events, organizations and activities.  *Id.*  Further, her position required her: to sit and stand at the

office and at a client's place of business, or in a car; walk within the office and while out

servicing clients; get in and out of a vehicle; occasionally stand, stoop, bend, or reach; lift up to

20 pounds; and have the manual dexterity sufficient to operate a computer, calculator, and

telephone.  *Id.*

After returning to Delap following her medical leave, Laurie's goal was to work 2.5 to 3

hours per day if possible.  AR 0206.  She eventually increased her work schedule to between 3

and 3.5 hours per day, while occasionally working up to 4 hours per day during tax season.  AR

0747, 1379.  Delap allowed her to work from home.  *Id.*  Many of her job duties, however, which

included training other employees, were less efficient or impractical to do away from Delap's

office.  AR 1136.

In November 2012, two months after her return, Laurie was working on weekdays and

sometimes on Saturdays, but she was unable to work three days in a row.  AR 206.  Even three

hours of work left her "very tired and . . . unable to concentrate."  *Id*.  In December 2012, she

worked 54 hours (three hours maximum per day).  AR 0208.  In January and February 2013, she

worked an average of 14 hours per week.  AR 0180.  In March 2013, Laurie increased her work

hours to an average of 3.5 hours per day for 6 days a week while working at home.  AR 0180,

1136.  She tried to get into her home office earlier in the morning, but it generally took three

hours to "warm up" and she began working by 10 a.m.  AR 0180.  Laurie worked a total of 85

hours in March, 67 hours in April, 63 hours in May, and 55 hours in June of 2013.  AR 1143.

During those months, she worked an average of four hours maximum per day and she "needed more rest after working more." *Id.* In October 2013, Laurie was finally able to work in the Delap office two days per week. AR 1150. Dr. Kasten noted that in 2013 Laurie had "shown gradual increased work tolerance and she appears to be trying her best to walk this line between increase work hardening and flaring fatigue." AR 1151.

Laurie is considered full time at 24 hours per week. ECF #34, at 8; ECF #36, at 4. However, she has only worked an average of 16 hours per week since her CFS crash in May 2012. Laurie worked 1,266 hours in 2011 (AR 1170), 550 hours in early 2012 before taking the leave of absence (AR 1179), and another 152 hours in late 2012 for a total of 772 hours in 2012 (AR 1199), and 793 hours in 2013 (AR 1223).

## III.   STD and LTD Plan Terms

At the time of Laurie's 2012 CFS crash, Delap held Group STD and LTD Plans through United. AR 0001–45, 0647–93. Laurie is covered under both Plans. *Id.* Under the terms of the STD policy, if an eligible employee becomes "Disabled due to Injury or Sickness," United will pay a Weekly Benefit after the employee "satisf[ies] the Elimination Period shown in the Schedule relevant parts." AR 0029. The Maximum Benefit Period for receiving weekly STD benefits is "a continuous period of . . . 11 weeks." AR 0020.

> **Disability and Disabled** means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:
> (a) during the Elimination Period,[2] You are prevented from performing the Material Duties of Your Regular Job (on a part-time or full-time basis) *or are unable to work Full-Time*; and
> (b) after the Elimination Period, You are:
> (1) prevented from performing the Material Duties of Your Regular Job (on a part-time or full-time basis) *or are unable to work Full-Time*; and

---

[2] The "Elimination Period" under Delap's STD policy is 14 calendar days. AR 0044.

> (2) unable to generate Current Earnings which exceed 99% of
> Your Weekly Earnings due to that same Injury or Sickness.
>
> . . .
>
> **Material Duties** means the essential tasks, functions, and operations relating to
> Your Regular Job that cannot be reasonably omitted or modified.

AR 0039–40 (emphasis added).

Under the terms of the LTD policy, if an eligible employee becomes "Disabled due to Injury or Sickness," United will pay a Monthly Benefit of 60% of the employee's Basic Monthly Earning, or the maximum monthly benefit, which is $10,000.00.  AR 0649, 0671.

> **Disability and Disabled** mean that because of any Injury or Sickness, a
> significant change in Your mental or physical functional capacity has occurred in
> which You are:
>
> (a) prevented from performing at least one of the Material Duties of Your
> Regular Occupation on a part-time or full-time basis; and
>
> (b) unable to generate Current Earnings which exceed 99% of Your Basic
> Monthly Earnings due to that same Injury or Sickness.
>
> . . .
>
> **Material Duties** means the essential tasks, functions, and operations relating to
> an occupation that cannot be reasonably omitted or modified.  In no event will We
> consider working an average of more than 40 hours per week in itself to be a part
> of material duties.  *One of the material duties of Your Regular Occupation is the
> ability to work for an employer on a full-time basis.*

AR 0682–83 (emphasis added).

The Plan provides a "work incentive" provision allowing an eligible employee to receive the monthly LTD benefit while continuing to work:

> You may work for wage or profit while Disabled.  As a work incentive,
> You will receive the Monthly Benefit, unless the sum of:
>
> (a)  the Gross Monthly Benefit while You are Disabled; plus
>
> (b)  Current Earnings;
>
> exceeds 100% of Your Basic Monthly Earnings.  If this sum exceeds 100% of
> Your Basic Monthly Earnings, the Monthly Benefit will be reduced by that excess
> amount.

AR 0659.

///

**IV.    Claims for STD and LTD Benefits**

Laurie made claims with United for STD benefits for the 11-week period in which she was unable to work.  At the same time, Laurie filed a claim for full LTD benefits to cover her leave during August, September, and October 2012, and for partial LTD benefits for the period when she returned to work part time in October 2012.  Laurie's STD claim was initially denied on November 20, 2012 (AR 401–05), and upon appeal on August 22, 2013.  AR 0081–86.  Her LTD claim was denied on March 19, 2014 (AR 941–51), and again on appeal on September 16, 2014.  AR 0702–06.

**1.    Medical Opinions**

In response to Laurie's claims, several medical opinions were solicited, which are synopsized below:

**A.    Thomas Kasten, M.D. (Laurie's treating physician)**

Dr. Kasten is a family practice doctor and has been Laurie's primary care provider since 2007.  AR 0245.  Excerpts from his medical reports are set forth *supra* Section I.  However, Dr. Kasten restated and explained his medical opinions in three different letters to United.

On November 12, 2012, Dr. Kasten sent a letter to United, opining that Laurie is unable to work even her part-time schedule in a "sustained manner everyday [sic] of the week" because flare ups cause her to have worsening fatigue in following days:

> [Laurie] has been unable to work in any productive manner despite her work being fairly sedentary by nature.  Fatigue comes from not only physical exertion but mental exertion as well.  Tasks as [simple] as standing and sitting can be exhausting for [Laurie].  I have reviewed with [Laurie] her job description and duties. . . .  Her job requires her to sit most of the time, standing at others while conferencing with clients or colleagues.  Her fatigue can be brought on even by sitting.  During this time of her leave, her fatigue has been severe enough that even sitting for 2 hours has been intolerable at times.  She can recuperate if allowed to lay down with her head supported.  During this leave, the demand of her jobs requiring her to stand for even less than an hour have been too great as

her stamina does not allow that.  Given her inability to even show at times points to a level of disability that prevents her from working for more than 3 hours in a row.  She may be able to work for a few hours on a few days a week with breaks in between but unable to do that in a sustained manner every day of the week. . . . When she is in a flare, her exertion always put[s] her at risk of worsening fatigue the following day.
. . .
Her mental and intellectual capacity has not been fully tested but it makes sense that her fatigue prevents her from being able to concentrate and attend to her work in a continuous fashion as is necessitated by the tasks for which she is responsible.
. . .
Her commute is also a factor in her exhaustion.  Time taken for commute is currently time taken away from her potential productive work hours.
. . .
[D]uring the time of her leave, she has been completely incapacitated by fatigue and unable to work in her conventional office setting.

AR 0245–46.

On March 21, 2013, Dr. Kasten wrote another letter refuting United's opinion that Laurie could perform sedentary work.  Dr. Kasten reiterated that Laurie was unable to maintain a consistent schedule in a "sustained manner everyday [sic] of the week" because it "resulted in severe fatigue on subsequent days":

Laurie is and has been disabled.  She has been unable to perform sedentary work as a defined by the Department of Labor and described clearly in the denial letter sent to her.  During the time of her leave for which she sought disability benefits this past year, she has been unable to work for more than 3 hours in a row even though that is sedentary work.  She has most definitely been unable to sit and hold her head up and attend to her accounting and consulting work for 6 hours out of an 8-hour workday.  She had been unable to sit for 6 hours out of an 8-hour workday even without performing the mentally taxing requirements of another part of the definition of sedentary work.  More importantly, she is unable to concentrate and attend to tasks required of her job for an adequate number of hours to qualify as performing the Materials Duties of her position.  There were times when she had been unable to work 3 hours [in] a row a few days a week with breaks in between but unable to do that in a sustained manner everyday of the week.  When attempted, this limited amount [of] work resulted in severe fatigue on subsequent days which prevented her tolerating any exertion greater than the basic activities of daily living.  It is my medical opinion that [Laurie] has been severely disabled by chronic fatigue syndrome as per the standards laid out

in her claim denial letter.  It is also clear from reading this letter that the content of my previous letter dated November 13, 2012 was not considered.

AR 0235.

On January 29, 2014, Dr. Kasten wrote a third letter in support of Laurie's STD and LTD claims again reiterating that she was unable to work 24 hours a week without "serious risk of suffering another severe flare" of her CFS symptoms:

> This illness is disabling because it reduces her tolerance of activities normally expected of a healthy individual.  Her baseline tolerance of physical activity (including, activities of daily living, doing minor physical tasks such as light housekeeping or walking, as well as cognitive tasks such as those needed to work as an accounting specialist) is greatly limited by this disease to greater than 50% of her pre-diagnosis levels.  The post-exertional fatigue to which she is susceptible can leave her with lasting symptoms of worsened fatigue for days after increased activity.  It was after tax season of 2012 during which typical increased demands on her work productivity led to a "crash" of increased symptoms including fatigue, increased sleep requirement, [drowsiness], lightheadedness, shortness of breath and increased heart rate.  She [has] not return[ed] to a level of functioning since this "crash."
> . . .
> Symptoms since 5/2012 had initially made it impossible for her to work at all and, after slow improvement she remains limited to working roughly half that.  Although physically she need only sit and hold her head up, use the mouse and keyboard and spend minimal time walking or standing, these activities are very physically demanding on a person who does not tolerate being out of bed more than a handful of hours on many days of the week.  Her conditions prevent her from even washing her hair on some days[,] and limits the hours that she can spend in even an upright seated position.  If she were asked to work 24 hours or more each week as she was doing prior to her crash in May 2012, she would be at serious risk of suffering another severe flare of her chronic fatigue syndrome symptoms and this would make it impossible for her to do any work at all.  It remains a goal that she be able to return to a level of work tolerance such that she could work 24 or more hours a week.  However, in order to avoid another crash, she has, under my direction, tried to titrate the tolerable amount of work, balancing this with the minimum demands of her job as carefully as possible.  I am aware and have read a copy of the definition of disability published in her long-term disability policy and I believe she is disabled on the basis of this definition.  [Laurie] is unable to work her part-time schedule let alone her full-time schedule which is one of the Material Duties of Regular Occupation described.  She has certainly been disabled according to this definition since her crash in May 2012.  From my observation, it is not for lack of trying that she is unable to work these hours, it is due to her physical condition.

12 – FINDINGS AND RECOMMENDATIONS

AR 1254–55.

### B.    Sarah Schmit, R.N. (Nurse paper reviews)

Laurie's medical history was first reviewed by United's in-house Nurse Case Manager,

Sarah Schmit, R.N., on July 16, 2012.  Nurse Schmit ultimately conducted three paper reviews of

Laurie's file.  The second and third reviews were held in September and November of 2012.  AR

1473, 1492, 1495.

In her final paper review, Nurse Schmit concluded that there were no tests or physical

findings to corroborate Laurie's complaints and that she was able to work her "regular schedule":

> As per the [Attending Physician Statement] by Dr. Thomas Karsten[sic] MD
> Family Practice dated 9/21/12 states the claimant has symptoms of severe fatigue
> daily weakness associated with shaking hands, increased heart rate with minimal
> exertion (sitting upright), lightheadedness, decreased concentration.  Severity
> varies from 1/10-9/10 depending on duration of activity and depending on the
> day.  Other diagnosis[sic] have been excluded by multiple negative test results.
> No physical findings other than subjective complaints.  Diagnosis has been
> confirmed by several experts.
> . . . .
> Available documentation does not provide a description of impairment that would
> preclude the claimant from working her regular schedule.

AR 1495–96.

### C.    Jerome Siegel, M.D. (Physician paper review)

In June 2013, Jerome Siegel, M.D., board certified in internal medicine and occupational

medicine, conducted a paper review of Laurie's file.  Dr. Siegel found there "is no information

that supports symptom magnification, exaggeration, or secondary gain."  AR 0161.

Dr. Siegel recognized that Laurie has had "waxing and waning energy and stamina" and

at times reported feeling exhausted and barely able to perform activities of daily living.  AR

0158–59.  Dr. Siegel concluded that Laurie's subjective complaints outweighed any "objective"

medical evidence, and opined that she could work at least part time up to five hours a day:

Despite these multiple subjective complaints, there is no indication that any clinician including Dr. Kasten has had to order any visiting nurse or homecare services including chore services, meal preparation, home health aide services, or transportation services. There is no indication that she has been seen or evaluated by a neurologist, psychiatrist, psychologist, or undergone any neuropsychological evaluation to evaluate any cognitive deficiencies.
. . . .
There is no indication in the Ms. Laurie has been hospitalized or required any inpatient evaluation during the extended period of time that she has been out of work. There is also no indication that she has required frequent office visits or emergency room evaluations during the time that she has been out of work. She has otherwise been noted to be medically stable with subjective complaints that far outweigh any objective physical examination or laboratory abnormalities. Given this, it is unclear why she would be unable to perform at least part-time work activities up to 5 hours during the day. Similarly it is unclear why she would have been unable to leave her house or take daily walks as part of a home exercise program to improve her overall stamina and endurance. There is no exercise stress test ordered or performed to quantitate the claimant's stamina, endurance, or fitness level.
. . . .
Dr. Kasten had also implied that Ms. Laurie had an unpredictable course with her chronic symptomatology. This is primarily subjective and not directly corroborated by any clinician, specialist, rehabilitation specialist, physical therapist, or occupational therapist. It is unclear why she would not have been able to perform at least a few hours per day of meaningful and productive work activities given the job description reviewed. Although Ms. Laurie has had subjective complaints of sleep, fatigue, and cognitive complaints, there is no indication that her clinicians including Dr. Kasten had restricted her ability to do driving activities.

AR 0158–59.

Dr. Siegel recognized that the medical records showed that Laurie missed an intermittent one to two days off from work, which required reduced hours on following days, and that some flexibility in modifying her schedule could be supported:

She may have required an intermittent one to two days to be out of work. She may have also required an intermittent 1-2 days to decrease her hours from an average of 4-5 hours per day to less hours such as 1-2 hours on a particular day based on her symptomatology or flare of chronic fatigue complaints. There is no support for extended restriction of hours, days, weeks, or months in which she would have been unable to perform the listed work activities in the job description. Some consideration and flexibility in modifying her work schedule by 1-2 hours per day or leaving early from work could be supported on the basis

of the chronicity of her symptoms, recent flare of symptoms in May, 2012, and
history of chronic fatigue syndrome.

AR 0160.

Dr. Siegel also stated there was no indication Laurie had undergone an evaluation by a

rheumatologist, when in fact, she had seen a rheumatologist, Dr. Ghandler, in 2004.  AR 0159,

0166, 0176.

### D.      Richard Kolbell, Ph.D. (Neuropsychological IME)

Richard Kolbell, Ph.D., is Board Certified in Clinical Neuropsychology.  AR 0753.  Dr.

Kolbell conducted an in-person, independent neuropsychological evaluation of Laurie on July

22, 2014.  AR 0740.  Dr. Kolbell's report spans 12 pages.  He dedicates 3 pages to summarizing

Laurie's medical history, the next 4.5 pages discussing his forensic interview, the next 3 pages

discussing his findings, and then concludes by answering questions raised in United's referral

letter.  Dr. Kolbell used multiple measures to test Laurie's verbal comprehension, perceptual

reasoning, working memory, processing speed, full-scale IQ, and general intellectual ability.  AR

0748–49.  Dr. Kolbell used these test results to assess Laurie's attention, concentration, tracking,

memory and new learning, language, visuoperceptual/constructional function, conceptual

formation and reasoning, and psychological abilities.  AR 0749–51.

Dr. Kolbell reported:

Based on the results of the current examination, I find no evidence of any
diagnosable psychological or neuropsychological condition.  Examinee is a very
pleasant fifty-two year-old CPA with a long history and well-documented medical
record indicating chronic fatigue syndrome.
. . . .
There have been subjective reports of "brain fog," although mental status
examinations have been entirely within normal limits, and neurodiagnostic studies
were also reported as normal.  Thus, there is no evidence from the medical record
that the examinee met criteria for diagnosis of depression, anxiety, neurocognitive
disorder, or any other psychological diagnoses.  She has been involved in
counseling, which reportedly focused chiefly on marital communication, stress

15 – FINDINGS AND RECOMMENDATIONS

management in dealing with her teenage son, and managing her sleep hygiene;
there are no records of any treatment of depression, anxiety, or any other specific
mental health condition.

. . . .

There were no signs of any cognitive disorder or deficits during the extensive
interview and neuropsychological testing.  [Laurie] was able to remain on task
and focused and responded appropriately throughout the interview and all aspects
of testing.  There was no evidence of symptom exaggeration or sub-optimal
performance and effort on any measures, and she provided a valid exam.  She is
extremely bright, and there are no signs of cognitive deficits:
neuropsychologically, she is fully intact.  On psychological measures, there is
evidence that she tends to be somewhat perfectionistic and stress-reactive
physically, in that she may experience an increase in physical symptoms in
response to psychological or environmental stressors.  However there is no
evidence that these rise to the level of a frankly diagnosable conditions such as
anxiety disorders or somatoform disorder.

. . . .

[T]here are no patent neuropsychological deficits or psychological conditions that
patently impair her abilities to perform daily activities.  She completed a seven
hour neuropsychological evaluation, with no decline in test performance
throughout the course of the current examination.

. . . .

There are no inconsistencies within the medical record or between the medical
record and the current examination with respect to her psychological and
neuropsychological functioning.

AR 0751–53.

### E.    Tanya Lumpkins, M.D. (Physician paper review)

Tanya Lumpkins, M.D., is board certified in rheumatology and internal medicine.  AR

0753.  Dr. Lumpkins conducted a paper review of Laurie's medical records and attendant

documents on September 2, 2014.  This was United's final medical consultation.  Dr. Lumpkins

noted that the diagnosis of CFS is based on subjective reports, and that "objective support for

subjective complaints is not generally seen in CFS":

> Chronic fatigue syndrome is a complicated disorder characterized by extreme
> fatigue that can't be explained by any underlying medical condition.  The fatigue
> may worsen with physical or mental activity, but doesn't improve with rest
> . . . .
> There's no single test to confirm a diagnosis of chronic fatigue syndrome.  You
> may need a variety of medical tests to rule out other health problems that have

similar symptoms.  The diagnosis of CFS is based on subjective reports and the treatment tor her fatigue has been consistent with the medical community for chronic fatigue.  Objective support for subjective complaints is not generally seen in CFS.  [Laurie's] fatigue has been noted consistently throughout the timeframe in question. . . .

AR 0729.

Dr. Lumpkins noted the results of Dr. Kolbell's neurological testing:

Examinee is able to perform all daily activities, including routine or low-stress activities to more complicated and difficult tasks with no interference from a purely psychological and/or neuropsychological standpoint.  She reportedly is no longer able to do several activities that she previously enjoyed . . . due to fatigue.  She described her limitations in these activities as solely related to her fatigue.  She reportedly makes errors in some complex accounting tasks, and she becomes fatigued when she exceeds a 4 hour per day work day.  However, there are no patent neuropsychological deficits or psychological conditions that patently impaired her ability to perform daily activities.  She completed a seven hour neuropsychological evaluation, with no decline in test performance throughout the course of the current examination.

AR 0752–53.  She concluded that Laurie's claim of disability was not "objectively" supported:

It is this reviewer's opinion that the recommendation that the claimant be considered totally disabled is not supported by the medical record.  It is noted within the medical record that the claimant has been indeed working although on a part-time basis.  She has both the cognitive and physical capacity to work.  It has not been objectively supported that she is unable to do so as she self reports that she has continued to work during the timeframe in question. . . .  The self reported function is the best support that the claimant is not totally disabled as she has been working in a part-time capacity.

AR 0731.

## 2.    <u>United's Denial Letters</u>

United first denied Laurie's claim for STD benefits in November 2012.  AR 0401.

United listed the Plan terms (AR 0401), explained the criteria used to make the disability

determination (AR 0401–02), listed the information used to make the determination (AR 0402),

explained the Department of Labor's definition of sedentary work (*Id.*), and summarized

Laurie's doctor visits, doctors' notes, and Dr. Kasten's physician statement (AR 0402–04).

United concluded that "based on the medical documentation that we received, you would be capable of frequently lifting small objects weighing less than 10 pounds and can sit for 6 hours in an 8-hour day.  Therefore, no benefits are payable, and your claim has been denied."  AR 0402.

In its August 2013 letter denying Laurie's appeal for STD benefits, the claims manager included Nurse Schmit and Dr. Siegel's paper reviews in the information it considered in making the disability determination.  AR 108.  As in the first letter, the claims manager summarized the medical record, omitting any reference to Nurse Schmit's findings, but including Dr. Siegel's findings:

> Despite these multiple subjective complaints, there is no indication any clinician has had to order any visiting nurse or homecare services.  She is noted to be medically stable with subjective complaints that far outweigh any objective physical examination or laboratory abnormalities.  Ms. Laurie should have been physically capable of at least part-time sedentary to light physical demand work from May 6, 2012, forward.  She may have required an intermittent one to two days to be out of work and an intermittent decrease in her hours based on her symptomatology on a given day.

AR0110–11.  United again concluded: "In summary, there is no medical support for restrictions and limitations that would prevent Ms. Laurie from performing the material duties of her regular job."  AR0111.

United denied Laurie's claim for LTD benefits in March 2014.  No additional medical providers had reviewed Laurie's file since the denial of her appeal for STD benefits.  The only additional material that had been submitted was another letter from Dr. Kasten restating his opinion that Laurie could not work more than part time.  United concluded:

> In summary, the information that we received, including a review from Dr. Siegel which opined that there was no support for extended restriction of hours, days, weeks or months in which she would have been unable to perform work activities, fails to substantiate the basis for restrictions and limitations that preclude her from performing the Material Duties of her Regular Occupation as a Tax Principal.

AR 0949.

18 – FINDINGS AND RECOMMENDATIONS

In July 2014, almost four months after initially denying Laurie's LTD claim, United

ordered an independent neuropsychological evaluation by Dr. Kolbell.  Two months later, Dr.

Lumpkins performed an additional paper review.  United issued a final denial letter on

September 16, 2014:

> Based upon his evaluation Dr. Kolbell, opined that Ms. Laurie was able to
> perform all of her activities of daily living including routine or low-stress
> activities to more complicated and difficult tasks with no interference from a
> psychological and/or neuropsychological standpoint.  Ms. Laurie reported having
> difficulties in her activities due to her fatigue.  However, Dr. Kolbell determined
> that there were no neuropsychological deficits or psychological conditions that
> would impair her abilities to perform tasks.  Ms. Laurie was capable of
> completing a seven-hour neuropsychological evaluation with no decline in test
> performance throughout.
> . . . .
> Dr. Lumpkins opined that the assertion of Ms. Laurie being totally disabled is not
> supported by the medical records.  Dr. Lumpkins determined that Ms. Laurie has
> both the cognitive and physical capacity to work.  Furthermore, Ms. Laurie has
> admitted to working on a part-time basis.

AR 0703–04.

<strong><u>FINDINGS</u></strong>

## I.    <u>Standard of Review – Abuse of Discretion</u>

Initially, this court must determine the applicable standard of review to evaluate United's

decision to deny Laurie's claims.  In the Ninth Circuit, "unless plan documents unambiguously

say in sum or substance that the Plan Administrator or fiduciary has authority, power, or

discretion to determine eligibility or to construe the terms of the plan, the standard of review will

be *de novo*." *Sandy v. Reliance Standard Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000); *Stephan

v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 923 (9th Cir. 2012) (citing *Metro. Life Ins. Co. v.

Glenn*, 554 U.S. 105, 113 (2008)).  Otherwise, the standard of review is for abuse of discretion.[3]

---

[3] Where the abuse-of-discretion standard applies in an ERISA-benefits-denial case, a motion for
summary judgment is merely the conduit to bring the legal question before the district court and

*Stephan*, 697 F.3d at 929 (citing *Glenn*, 554 U.S. at 113).  Here, the parties agree that the standard of review is for abuse of discretion.

Under the abuse-of-discretion standard, an ERISA plan administrator's decision "will not be disturbed if reasonable."  *Conkright v. Frommert*, 559 U.S. 506, 521 (2010).  The plan administrator's decision will be upheld unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011).  "[E]ven decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion.  An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact."  *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (internal quotations and citations omitted).

The abuse-of-discretion standard of review "does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is 'relevant evidence [that] reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."  *Roth v. Prudential Ins. Co. of Am.*, 752 F. Supp. 2d 1160, 1165 (D. Or. 2010) (quoting *Snow v. Standard Ins. Co.*, 87 F.3d 327, 332 (9th Cir. 1996) (en banc).  "Even if the court disagrees with the ultimate decision, deference must be given to the administrator unless it is clearly unreasonable."  *McCloud v. Hartford Life & Acc. Ins. Co.*, 910 F. Supp. 2d 1226, 1230–33 (D. Or. 2012).

"The court must consider numerous case-specific factors . . . and reach a decision as to whether discretion has been abused by weighing and balancing those factors together."  *Montour*

---

the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.  *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012).

*v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009) (citing *Glenn*, 554 U.S. at 116). Factors that "frequently arise" in ERISA cases include: (1) the quality and quantity of medical evidence; (2) whether the plan administrator subjected the claimant to an in-person medical evaluation or merely relied on a paper review of the claimant's existing medical records; (3) whether the administrator provided its independent experts with all of the relevant evidence; and (4) as applicable, whether the administrator considered a contrary Social Security Administration ("SSA") disability determination. *Id.* at 630. Courts are directed to "reach a decision as to whether discretion has been abused by weighing and balancing [the] factors." *Id.*

In this case, the relevant factors are: 1) United's structural conflict of interest, 2) the quantity and quality of the medical evidence, including the extent to which United conducted paper reviews, 3) whether United discounted or ignored Laurie's subjective complaints, 4) whether United imported an objective evidence requirement into the Plan, and 5) whether United's Plan interpretation is consistent with the Plan's clear language. When the above factors are considered, United's decisions to deny Laurie STD and LTD benefits were clearly unreasonable, and therefore an abuse of discretion.

### 1.   Structural Conflict of Interest

Where the "same entity that funds an ERISA benefits plan also evaluates claims, . . . the plan administrator faces a structural conflict of interest. . . ." *Montour*, 588 F.3d at 630. The administrator is subject to the conflicting incentives of approving benefits to deserving plan participants as well as to paying as little in benefits as possible to preserve its coffers. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965–66 (9th Cir. 2006). In that event, "the conflict must be weighed as a factor in determining whether there was an abuse of discretion." *Id.* at 965 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Importantly, however,

this "does not convert abuse of discretion review into *de novo* review." *Salomaa*, 642 F.3d at 674 (citing *Glenn*, 554 U.S. at 113). Therefore, the court must decide the appropriate weight, if any, to be given to United's structural conflict of interest.

The decision is "something akin to a credibility determination about the . . . plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Id.* at 969. "If those facts and circumstances indicate the conflict may have tainted the entire administrative decision-making process, the court should review the administrator's stated bases for its decision with enhanced skepticism: This is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred." *Montour*, 588 F.3d at 631. "An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might." *Id.* at 968. "The level of skepticism . . . may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. *Abatie*, 458 F.3d at 968.

Common examples of evidence that the administrator's conflict permeated the claims decision include when an administrator has given "'inconsistent reasons for denial,' has failed 'adequately to investigate a claim or ask the plaintiff for necessary evidence,' has failed to credit a claimant's reliable evidence,' or has 'repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly.'" *Abatie*, 458 F.3d at 969–70. "Where . . . an insurer has 'taken active steps to reduce potential bias and to promote accuracy,' the conflict may be given minimal weight in reviewing the insurer's benefits decisions. *Stephan*, 697 F.3d at 929 (citing *Glenn*, 554 U.S. at 117).

Here, United is both the administrator and the underwriter of the Plan. Both the STD and

LTD policies expressly and unambiguously confer discretionary authority on United:

> The Policyholder has delegated to Us the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them.

AR at 0006, 0677. Therefore, United operates under the inherent conflict of interest identified in

*Abatie* when it evaluates claims from participants such as Laurie.

Laurie asserts that an enhanced level of skepticism is warranted. She quotes the five

factors[4] in *Collins v. Liberty Life Assur. Co. of Boston*, 988 F. Supp. 2d 1105, 1127 (C.D. Cal.

2013), and claims that four are present here. Laurie's Motion for Summary Judgment, ECF #34,

at 30–31. However, Laurie does not identify what those four factors are or elaborate on how any

bias warrants heightened scrutiny in this case. Furthermore, United contends that it produced

over 2,100 pages of discovery on the issue of conflict of interest (in response to Laurie's 35

requests for production), yet Laurie has submitted no documents suggesting a bias to the court.

United's Motion for Summary Judgement and Response to Laurie's Motion for Summary

Judgment, ECF #36, at 18.

There is no evidence of malice, self-dealing, or of a lack of parsimonious claims-granting

history that would compel this court to view United's decision with the highest level of scrutiny.

---

[4] The Collins court compiled a non-exhaustive list of factors to consider when determining the appropriate amount of deference to give to a Plan administrator's decision to deny disability benefits, citing *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 875 (9th Cir. 2008) and *Montour*, 588 F.3d at 635. *Collins v. Liberty Life Assur. Co. of Boston*, 988 F. Supp. 2d 1105, 1127 (C.D. Cal. 2013) ((1) ignored self-reports that are inherently subjective and not easily determined by objective measurement; (2) had a meaningful dialogue with claimant in deciding whether to approve the benefits claim; (3) spoke with claimant's doctors without notifying claimant, (4) took claimant's doctors' statements out of context or otherwise distorted them, or (5) conducted a "pure paper" review).

Accordingly, the level of skepticism with which the court should view United's structural conflict of interest should be low.

      **2.**    <u>**Quantity and Quality of Medical Evidence**</u>

On balance, the quantity and quality of medical evidence weigh toward finding United abused its discretion.  United argues that it could not have abused its discretion because it relied on substantial evidence to deny Laurie's claims, specifically: "(1) four medical reviews performed by two RNs; (2) independent medical records reviews performed by two MDs, both of whom were board certified in appropriate medical specialties; and (3) a thorough IME [(independent medical exam)] performed by an independent and qualified neuropsychologist." ECF #50, at 6–7.  First, while the nurses' medical reviews support the position that Laurie is not disabled, registered nurses are not board certified in the appropriate medical specialties and are thus not qualified to diagnose or prescribe treatment for CFS.  Second, while Dr. Siegel and Dr. Lumpkins have the required credentials, they conducted only a paper review and United failed to obtain an in-person examination by an appropriate specialist.  Finally, while Dr. Kolbell is a qualified neuropsychologist, his IME test results do not refute Laurie's subjective symptoms of fatigue.

United is required to consult health care professionals with the appropriate training and experience.  29 CFR 2560.503–1(h)(3)(iii) ("the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment").  However, United first relied exclusively on Nurse Schmit's medical judgment to deny Laurie's claim for STD benefits.  AR 0081–86, 0401–05.  Later, when denying Laurie's appeal for STD benefits, United relied again on Nurse Schmit's paper review, and on an additional paper review by Nurse Cortese, R.N.  AR 1481–85.  Registered nurses are

not board certified physicians and are in no position to diagnose or prescribe treatment for CFS. Nurses "accept and implement orders for client care from licensed health care professionals who are authorized . . . to independently diagnose and treat" patients, but they do not write the orders themselves.  OAR 851-045-0040 (6)(a).  Moreover, nurse opinions are not acceptable medical sources in the analogous Social Security disability context.  20 CFR 404.1513(d)(1) (listing medical opinions of nurse practitioners, a type of nurse with more training and education than a registered nurse, as a non-acceptable medical source).  This is not to say that a nurse's medical opinion is irrelevant.  Indeed, courts have cited 20 CFR 404.1513 for the notion that testimony by even family and friends may constitute "competent evidence" and courts may consider it. *E.g.*, *Jahn-Derian v. Metro. Life Ins. Co.*, 13-cv-7221-FMO, 2016 WL 1355625, at *10 (C.D. Cal. Mar. 31, 2016).  However, United fails to explain or justify why it gave more weight to the medical opinions of nurses obtained by paper reviews than the medical opinion of Laurie's treating physician when those opinions directly contradict each other.  This weighs toward abuse of discretion.

With respect to Dr. Siegel and Dr. Lumpkins' paper reviews, a paper review by itself does not necessarily constitute an abuse of discretion.  *See Corby v. Unum Life Ins. Co. of Am.*, 2010 WL 3768040 at *6 (N.D. Cal. Sep. 21, 2010) ("The 'pure paper' review by itself does not constitute an abuse of discretion.").  However, "one factor that courts consider when determining if a plan administrator abused its discretion, particularly in cases where the administrator has a conflict of interest, is whether the plan administrator conducted only a paper review of the claimant's file."  *Robertson v. Stand. Ins. Co.*, 139 F. Supp. 3d 1190, 1204 (D. Or. 2015); *see also Eisner v. The Prudential Ins. Co. of Am.*, 10 F. Supp. 3d 1104, 1115 (N.D. Cal. 2014) ("Prudential's internal file review and two independent medical reviews suffer from several

deficiencies that require the Court to give them less weight than Plaintiff's medical evidence.
Most importantly, as in *Salomaa*, none of Prudential's consultants examined Plaintiff—although
they could have.").

"[T]here are circumstances under which a plan administrator should conduct an IME."
*Id.* at 1207 (citing *Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112, 1123 (D. Or.
2013). "[W]here there [is] sufficient evidence in the record to support [a claimant's] contentions,
including the opinions of her treating physicians," the insurance company has "a fiduciary duty
to engage in a meaningful dialogue with [her] and to request an IME or whatever additional
evidence it deemed necessary to confirm or to deny [her] assertion of cognitive impairment."
*Petrusich*, 984 F. Supp. 2d at 1123. When it does not, the court questions whether the insurance
company has chosen "to avoid an independent medical examination because of the risk that the
physicians it employs may conclude that the claimant is entitled to benefits." *Salomaa*, 642 F.3d
at 676. "The skepticism [the court] is required to apply because of the plan's conflict of interests
requires [it] to consider this possibility[.]" *Id.*

Here, there is sufficient evidence in the record, including the opinion of Laurie's long-
treating physician, Dr. Kasten, to support her contention that she is disabled. Courts "routinely
weigh" records of treating physicians "more heavily than they do reports and file reviews from
paid consultants who never examine the claimant or talk to the claimant's treating physicians."
*Eisner*, 10 F. Supp. 3d at 1115. Moreover, where the diagnosis, such as CFS in this case, is
based on subjective symptoms, it "can be evaluated more fully through an actual examination
than by a mere review of a patient's medical record." *Heinrich v. Prudential Ins. Co. of Am.*,
No. 04–cv–02943–JF, 2005 WL 1868179, at *8 (N.D.Cal. July 29, 2005) ("[T]he failure of
Prudential's physicians to perform their own examinations of Heinrich entitles their opinions to

less weight, because fibromyalgia produces symptoms that must be reported by the patient to the physician.").  Under the circumstances, United should have had a board certified rheumatologist perform an IME to help determine the veracity of Laurie's self-reported symptoms.

United argues it did exactly what it should have, specifically it retained an IME to answer the question of whether Laurie's CFS compromises her ability to perform the mental aspects of her job.  United's Reply in Support of its Motion for Summary Judgment, ECF #50, at 10. United argues that Dr. Kasten's medical opinion left an open question when he wrote "Laurie's mental and intellectual capacity has not been fully tested but it makes sense that her fatigue prevents her from being able to concentrate and attend to her work in a continuous fashion as is necessitated by the tasks for which she is responsible."  *Id.*; AR 0245–46.  United contends that Dr. Kolbell's report answered that question in the negative.

Dr. Kolbell's report, however, is limited to psychological and neuropsychological functioning and does not contradict Dr. Kasten's medical reports documenting Laurie's fatigue. Specifically, Dr. Kolbell noted: "There are no inconsistencies within the medical record or between the medical record and the current examination with respect to her psychological and neuropsychological functioning."  AR 0753.

Moreover, Laurie does not contend that she cannot work full time because of depression, anxiety, a neurocognitive disorder, or any other neuropsychological condition—the disorders Dr. Kolbell's IME ruled out.  She argues that she cannot work full time because of the fatigue caused by her CFS.  Laurie does not claim that she always experiences brain fog or that she can never meet the mental demands of her job; she contends that she experiences these symptoms when she is fatigued.  These subtle but important distinctions must be accounted for.

United heavily relies on the fact that Laurie was able to complete a seven-hour examination with no decline in test performance to show she can work full time.  ECF #36, at 8, 14, 15; ECF #50, at 2, 10, 12.  However, as United's own expert, Dr. Siegel, recognized, Laurie's CFS symptoms "wax and wane."  AR 0158.  The significance of one good day cannot reasonably be extrapolated to every other day, especially when exertion on one day leads to an exacerbation of symptoms on following days.  *See* Medical Opinion of Dr. Kasten, AR 245–46, 0235, 1110–11, 1254–55.  Even Dr. Siegel and Dr. Lumpkins' reports provide support for Laurie's claim that pushing herself one day leads to an exacerbation of symptoms on subsequent days.  AR 0160, 0731.[5]  The evidence does not support the conclusion that Laurie can consistently work 24 hours a week, but, rather, refutes it.

Further, the demands of a neuropsychological IME may or may not be similar to the demands of Laurie's work as a tax principal.  The inference that, because Laurie was able to complete a seven-hour neuropsychological examination with no decline in test performance, she can handle complex tax matters 24 hours per week, every week—the crux of United's position—is too weak to reasonably be considered substantial evidence.

In summary, the quantity of medical evidence is lacking in that no physician board certified in rheumatology or internal medicine conducted an IME and United relied on paper reviews by registered nurses to deny the claims, and the quality of medical evidence is lacking in that the IME that was conducted by Dr. Korbell addressed the wrong issues.

///

---

[5] Dr. Siegel recognized that Laurie missed an intermittent one to two days off from work and was was able to work only reduced hours on following days.  AR 160.  Dr. Lumpkins stated that "the diagnosis of CFS is based on subjective reports," that the fatigue "may worsen with physical or mental activity, but doesn't improve with rest," and that Laurie has repeatedly reported her symptoms worsen after exerting herself.  AR 0722–23, 0729.

### 3. United discounted and ignored Laurie's subjective complaints

United abused its discretion by discounting and ignoring Laurie's subjective complaints, even though her treating physician's opinion credited and her colleagues' letters corroborated those complaints.

### A. Subjective Complaints

CFS is defined as a "self-reported persistent or relapsing fatigue lasting six or more consecutive months." *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) (*citing* Centers for Disease Control, *The Chronic Fatigue Syndrome: A Comprehensive Approach to its Definition and Study*, 121 ANNALS OF INTERNAL MED. 954 (1994)). It is a "complicated disorder characterized by extreme fatigue that can't be explained by any underlying medical condition." AR 729. "The cause of chronic fatigue is unknown, although there are many theories—ranging from viral infections to psychological stress. Some experts believe chronic fatigue syndrome might be triggered by a combination of factors." *Id.*

"There is no blood test or other objective laboratory test for chronic fatigue syndrome." *Salomaa*, 642 F.3d at 677. The condition "does not have a generally accepted 'dipstick' test." *Id.* Rather, one uses a "variety of medical tests to rule out other health problems that have similar symptoms." AR 0729. The diagnosis of CFS is therefore based on subjective reports. *Id.* "Objective support for subjective complaints is not generally seen in CFS." *Id.*

The lack of objective medical evidence in CFS cases creates the risk of false claims. *Salomaa*, 642 F.3d at 678. When a disability policy does not contain an exclusion for conditions based on subjective symptoms, such as CFS, the insurer "has taken on the risk of false claims for th[ese] difficult to diagnose condition[s]." *Salomaa*, 642 F.3d at 678. The insurer, however, has the same "financial incentive to cheat." *Id.* Thus, "conditioning an award on the existence of

[objective] evidence that cannot exist is arbitrary and capricious." *Id.* Instead, the insurer can only condition benefits upon evidence that the CFS symptoms have the effect of preventing a claimant from working. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004) (the administrator properly asked for evidence that the fibromyalgia she suffered from disabled her from working at her job); *Maher v. Aetna Life Ins. Co.*, 186 F. Supp. 3d 1117, 1129 (W.D. Wash. 2016) (insurer could not condition benefits on claimant's subjective reports of pain but could condition benefits upon evidence that the pain had the effect of preventing claimant from working).

Here, all three of United's medical consultants concluded that Laurie was not magnifying or exaggerating her symptoms or motivated by secondary gain. AR 0161, 0729, 0751. United's denial letters, however, do not explain why it rejected Laurie's subjective symptoms. Instead, United made conclusory statements such as that Laurie was not disabled "based on the medical documentation" or that "there is no medical support for restrictions and limitations that would prevent [her] from performing the material duties of her regular job." AR 0111, 0404. United abused its discretion by failing to address Laurie's subjective complaints.

## B.   Letters from Colleagues and Friends

In addition to discounting or ignoring Laurie's subjective complaints, United also discounted or ignored evidence corroborating those complaints, i.e., letters from her colleagues and friends. It is clear that courts may consider letters that are part of the record in their abuse-of-discretion analysis. *See, e.g.*, *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 905 (9th Cir. 2016) (insurer abused its discretion in rejecting claimant's subjective complaints, which were corroborated by a friend); *May v. Metro. Life Ins. Co.*, 03-cv-5056-CW, 2004 WL 2011460, at *7 (N.D. Cal. Sept. 9, 2004) (discussing how reports of the plaintiff's colleagues describing the

claimant's ability to work were consistent with the claimant's described symptoms); *Mason v. Fed. Express Corp.*, 165 F. Supp. 3d 832, 860 (D. Alaska 2016) (weighing as a factor in abuse-of-discretion analysis how a plan administrator failed to consider correspondence with the claimant's former supervisor, the only evidence in the record regarding the claimant's actual performance).

United cites *Loughray v. Hartford Group Life Ins. Co.* for the notion that it was not required to consider Laurie's colleague letters in the review and denial of her claims. 366 Fed. Appx. 913, 913 (10th Cir. 2010) (unpublished). However, this court reads *Loughray* the same way it reads *Demer, May,* and *Mason*—that letters from colleagues and friends can be probative of the veracity of a claimant's subjective complaints and can be considered as part of the administrative record and as a factor in whether the plan administrator abused its discretion. In *Loughray*, the court considered and discussed, but ultimately rejected the letters provided by the claimant's colleagues. *Id.* at 923, 928. But this is not to say that the court did not consider them. In fact, one of the reasons the *Loughray* court rejected the letters was because the colleague's statements "were not entirely consistent with the other evidence" in the plaintiff's medical records. *Id.* at 928.

Here, United and Dr. Lumpkins listed these letters as documents considered in their respective reviews of Laurie's file. However, neither mentions them in their summaries of her file or discusses why the letters were not credited. AR 0702–06, 0721–33, 0943–55.

Moreover, these letters are highly probative of the issue presented in this case: whether Laurie's subjective CFS symptoms prevent her from working. Four of Laurie's colleagues, a long-term friend, and her pastor all submitted letters corroborating the effects of her CFS.

William Hammerman, Director of Estate and Trust Services at Delap, described how Laurie's area of specialty is "working with clients that have complex estate, gift and fiduciary income tax issues."  AR 1260.  He described Laurie as a consummate team player with a Type A personality that led her to push herself too hard, resulting in her crash in 2012.  *Id.*  Since her crash, it is much more apparent when Laurie is having a good day versus having a bad day.  *Id.* Hammerman explained that even with the accommodations to Laurie's schedule and workload, she is still unable to work 24 hours per week as she had before the crash.  *Id.*  When Laurie pushes herself too hard to get a project done or meet a deadline, she tends to have a "mini-crash" that results in her not being able to work for one to two weeks.  AR 1261.

Delap's Managing Partner, David Delap, also confirmed that Laurie worked on difficult estate tax returns that required proper and creative interpretation of wills and trusts in order to effectively represent her clients.   AR 1263.  Additionally, he observed that, although Laurie desired to return to the "career she loves," she could not work 24 hours per week.  *Id.*  When she attempted to return to work, she suffered "a relapse where she cannot work at all":

> After her crash[,] we do not know which Lynn will show up for work.  Many days she lost all energy and alertness and was not able to perform at the level required to serve our clients at the level of accuracy, completeness and most importantly proper interpretation of will and trust narrative and the creative interpretation necessary to save our client's money.  Let alone the proper completion of difficult estate returns. . . .  Her attempts to get back to 24 hours per week have not been without trying. . . .  I believe with all my heart that Lynn desires to work as much as possible and return to the career she loves, one in which she is so talented.  She is a true professional.  However her CFS does not allow her to do this.  Numerous attempts on her part to return to work of any significant amount . . . sends her into a relapse where she cannot work at all.

*Id*.

Jan Pailthorpe, another CPA colleague, described how, prior to her crash, Laurie's "fatigue was observable from her body language and lack of stamina."  AR 1266.  "Her facial

expression became very flat and her coloring paled.  She would appear shaky and weak and could not stand for any length of time.  She also became quieter, limiting her ability to discuss technical issues or have lengthy conversations with employees or clients."  *Id.*  After the crash, her condition worsened and she was "demonstrably fatigued at the start of the day."  *Id.*  She would "work one to two hours and could not manage to think clearly or articulate concepts."  *Id.*

Pailthorpe described that Laurie's "ability to work at her intellectually demanding job has been profoundly limited and restricted by her CFS symptoms."  *Id.*  "She cannot work with any consistency or continuity, as she could prior to May 2012."  *Id.*  On days she can work, she can only do so for an hour or two before she needs to rest.  AR 1266–67.  "Some days, she cannot work at all.  If she pushes herself to work beyond her limits, her symptoms will flare up, putting her in bed for several days."  AR 1267.

Finally, Martha Westfall, an administrative assistant who has known Laurie for 20 years, described how Laurie used to be vivacious and outgoing, but has not been able to recover from her crash in 2012.  AR 1272.  Laurie's skin color "has faded to a greyish look," and "her overall countenance is sad, tired, and worn out."  AR 1273.  Westfall described Laurie as a "woman of principle" who would not take short cuts or cheat.  *Id.*  Despite her diagnosis, Laurie maintains a cheerful attitude and does not feel sorry for herself.  *Id.*  However, the last couple of years "has really taken the final toll," and she "cannot work on a consistent basis."  *Id.*

Laurie's colleagues at Delap work with her on a daily basis.  They have seen her struggle with fatigue since her initial diagnosis and her subsequent crash.  Their letters corroborate Laurie's subjective complaints and, importantly, Dr. Kasten's medical opinion over years of treatment.  Without belaboring the point, the letters also corroborate Laurie's inability to consistently work 24 hours per week, despite Delap's accommodations.

Laurie also submitted a letter from Julie Southgate, a close friend of 14 years. Southgate described the effects of Laurie's fatigue and her inability to work consistently:

> Due to her fatigue, Lynn was and still is unable to perform any household tasks such as cooking, cleaning, laundry, or grocery shopping. Her husband does all of these things for the family. She must rest frequently during the day. Also, even though she has very little social contact with others, she seems to catch every cold and flu virus. These frequent illnesses add to her fatigue. Lynn Laurie's ability to work at her intellectually demanding job has been profoundly limited and restricted by her CFS symptoms. She is only able to work on a much reduced schedule with the opportunity to stop, lie down and rest. She cannot work with any consistency or continuity. On days she can work, she can only do so for a time before she needs to stop and rest. Some days she cannot work at all. If she pushes herself to work beyond her limits, her symptoms will flare up, putting her in bed for long periods of time.

AR 1270.

Finally, Laurie submitted a letter from her pastor, Jack Smith, who has "prayed publicly and privately for her through years of medical treatment, watching her struggle to regain a measure of her former vitality." AR 1275. Pastor Smith specifically described the effects of Laurie's fatigue:

> I have observed her weakness and inability to summon the stamina for much of anything, including physical and mental tasks. She does not stand to sing with the congregation, and is often too weak to sing at all. If she tries to stay for fellowship after the morning service, she will often sit in a recliner from the nursery. The effort to be present Sunday morning uses up all her energy, and she is unable to return for the evening service.

> Lynn wants very much to be well and to do what she was once able to do, but it is obvious to anyone associated with her that she cannot.

*Id.*

While all these individuals—Laurie's colleagues and friends—are not medical professionals and do not have the medical training necessary to provide a medical opinion regarding Laurie's functional capacity, they are arguably in the best position to substantiate

Laurie's subjective complaints. United should not have dismissed them without discussion, and it was an abuse of discretion to do so.

### 4.    United Imported an Objective Medical Evidence Requirement into the Plan

United also abused its discretion to the extent it relied on an objective evidence requirement to deny Laurie's claims because its STD and LTD Plans do not include such a requirement. As discussed above, the Ninth Circuit held in *Salomaa* that "conditioning an award on the existence of [objective] evidence that cannot exist" is unreasonable. 642 F.3d at 678. Like Laurie, the claimant in *Salomaa* had CFS, a "condition for which there are no objective tests." *Id.* at 676. CFS is a diagnosis of exclusion. Dr. Lumpkins agreed when she included in her report that:

> [t]here's no single test to confirm a diagnosis of chronic fatigue syndrome. You may need a variety of medical tests to rule out other health problems that have similar symptoms. The diagnosis of CFS is based on subjective reports and the treatment tor her fatigue has been consistent with the medical community for chronic fatigue.

AR 0729.

The *Salomaa* plan administrator abused its discretion by requiring the claimant to present objective evidence of his diagnosis such as positive findings on x-rays and blood tests. 642 F.3d. at 679–80. Other district courts have found that plan administrators abused their discretion by relying on such requirements. *See, e.g.*, *Peterson v. AT&T Umbrella Benefit Plan No. 1*, 2011 WL 5882877, at * 26 (N.D. Cal. March 16, 2012) ("[T]o the extent the Plan relied on the absence of objective medical evidence of Plaintiff's Chronic Fatigue Syndrome, it abused its discretion."); *Eisner v. Prudential Ins. Co. of Am.*, 10 F. Supp. 3d. 1104, 1117 (C.D. Cal. 2014) (discounting medical reviews by insurer's nurse and doctor regarding CFS and fibromyalgia because they "demand diagnostic and clinical confirmation of a condition that cannot be

confirmed through such results"); *Hertz v. Hartford Life and Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1139 (D. Nev. 2014) (finding Hartford's "insistence on objective evidence" was "problematic because medical conditions such as chronic pain syndrome may not be amenable to objective verification"); *Duncan v. Cont'l Cas. Co., No.* 96–cv–2421–SI, 1997 WL 88374, at * 5 (N.D.Cal. Feb. 10, 1997) (Plan "may not deny [plaintiff's] claim because her physician cannot provide physiological proof where the physical condition is such that physiological proof is not available."); *Minton v. Deloitte & Touche USA LLP Plan*, 631 F. Supp. 2d 1213, 1219 (N.D. Cal. 2009) ("MetLife completely discounted the history of Plaintiff's condition, Plaintiff's subjective reports of pain and Dr. Hill's evaluation of Plaintiff's functional capacity. Instead, it relied exclusively on Dr. Payne's report, even though Dr. Payne had not examined Plaintiff or performed a functional capacity test on him, but instead rendered his opinion based on a lack of evidence that one would not expect to find in the first place.").

Here, Dr. Siegel specifically called for the sort of objective evidence *Salomaa* prohibited. He did so when he wrote that Laurie "has otherwise been noted to be medically stable with subjective complaints that far outweigh any objective physical examination or laboratory abnormalities," and then again when he wrote "that Ms. Laurie had an unpredictable course with her chronic symptomatology . . . is primarily subjective and not directly corroborated by any clinician, specialist, rehabilitation specialist, physical therapist, or occupational therapist."  AR 0158–59.  United quoted these portions of Dr. Siegel's text in denial letters to Laurie, incorporating the objective evidence requirement into its reasons for denial.  *See* AR 0110–11.

United's other experts also improperly relied on objective evidence in discounting Laurie's complaints.  Nurse Schmit did so when she wrote "[o]ther diagnosis have been excluded by multiple negative test results.  No physical findings other than subjective complaints.

Diagnosis has been confirmed by several experts," and then proceeded to conclude that Laurie was not disabled.[6]  AR 1495–96.  Dr. Lumpkins similarly concluded that Laurie's claim of disability was not "objectively" supported.  AR 731.

Lastly, to the extent United relies on Dr. Kolbell's IME results to deny Laurie's claims—when it argues in its briefing that Dr. Kolbell's IME is the "only comprehensive, objective testing of Laurie's functional abilities" in the record (ECF #50, at 11)—United is again importing an objective medical evidence requirement into the Plans.  Dr. Kolbell simply found that Laurie does not suffer from a mental health condition.  The other 18 physicians who saw Laurie ruled out many other conditions to arrive at a CFS diagnosis; the opinions of United's experts do not undermine Laurie's subjective complaints of fatigue.

### 5.    United's Plan Interpretation is Inconsistent with the Plan's Clear Language

The final factor is whether United's interpretation of the Plan is inconsistent with the Plan's clear language.  A plan administrator abuses its discretion when it "construes provisions of the plan in a way that conflicts with the plain language of the plan."  *Boyd*, 410 F.3d at 1178, *see also Montour*, 588 F.34d at 630–31 (holding a plan administrator abused its discretion when it construed the language of a plan unreasonably).

The STD and LTD Plans declare Laurie is entitled to benefits if she cannot work full-time, that is, if she is unable to work 24 hours per week.  ECF #36, at 13.  United argues that Dr. Siegel, Dr. Kolbell, and Dr. Lumpkins' medical opinions support the assertion that Laurie can

---

[6]  United argues it was reasonable for Nurse Schmit to conclude "the restrictions and limitations identified by Dr. Kasten in his reports were not corroborated and that, from a physical standpoint, Laurie is capable of performing sedentary work."  ECF #36, at 5; AR 0373. However, the phrase "from a physical perspective" is just another way of improperly importing an objective evidence requirement.

work 24 hours per week.  ECF #36, at 13.  United and its medical consultants, however, have

misconstrued and misapplied the terms of the Plan.

First, United disregards the limitations Dr. Siegel placed on the "five hours per day"

figure and incorrectly extrapolates that figure to a full work week.  United selectively quotes

from Dr. Siegel's report to support the assertion that he found Laurie was capable of working 25

hours per week.  ECF #36, at 2, 13.  Dr. Siegel wrote that "it is unclear why [Laurie] would be

unable to perform at least part-time work activities up to 5 hours during *the day*."  AR 0158

(emphasis added).  At no point, however, does Dr. Siegel state Laurie is capable of working 25

hours *per week*.  United incorrectly extrapolated Laurie's capacity to work for 5 hours in one day

to mean she could work 25 hours every week.  This directly contradicts what Dr. Siegel wrote

next: Laurie "may have required an intermittent one to two days to be out of work.  She may

have also required an intermittent 1-2 days to decrease her hours from an average of 4-5 hours

per day to less hours such as 1-2 hours on a particular day based on her symptomatology or flare

of chronic fatigue complaints."  AR0160.

Thus, for example, if Laurie works five hours on both Monday and Tuesday, two hours

on both Wednesday and Thursday because of a slight flare in her symptoms, and finishes with

four hours on Friday, she would have worked 18 hours—below the 24-hour threshold.  In fact,

this titrating of her schedule is exactly what Laurie has been doing per Dr. Kasten's

recommendations.  If Laurie modified her schedule by just one hour on two days—as Dr. Siegel

recognized she has done—she would fall below the 24-hour threshold.  It was unreasonable for

United to find one supportive statement, extrapolate the daily work capacity to a weekly work

capacity, and ignore the modifying statements immediately following that statement.  The Plan

terms do not say to divide the full-time work week into hours worked per day, and then find that

the claimant is not disabled if she can work that amount on any given day. Such an interpretation is inconsistent with the clear language of the Plan.

Second, United disregards that Dr. Lumpkins mistakenly understood the Plan terms to mean Laurie had to be totally disabled to be qualified as disabled. Dr. Lumpkins opined "the self reported function is the best support that [Laurie] is not *totally disabled as she has been working in a part time capacity.*" AR 0731 (emphasis added). This language suggests that Dr. Lumpkins was mistaken about the Plan terms and believed they required Laurie to be "totally disabled" to receive benefits. However, the question is not whether Laurie is "totally disabled," i.e., unable to work at all. The question is whether she is disabled under the Plan terms, i.e., unable to work 24 hours per week. Dr. Lumpkins' ultimate conclusion—that Laurie is not totally disabled—misses the point. It does not support United's position that Laurie is not disabled under the Plan terms, and relying on it to support a denial of benefits misinterprets those terms.

Third, with respect to Dr. Kolbell's IME, United misinterprets the Plan terms by equating the lack of a mental disorder with a lack of disability. Again, both the STD and LTD Plans require Laurie to be incapable of working 24 hours per week to be designated as disabled. Dr. Kolbell's findings that Laurie is extremely bright, does not suffer from depression or an anxiety disorder, and does not have a neuropsychological deficit or psychological condition do not show Laurie is capable of working a 24-hour week. Dr. Kolbell's findings simply add to the list of conditions and disorders ruled out by 18 other physicians and medical practitioners from 2003 to 2004 before Laurie was diagnosed with CFS.

Finally, similar to United's 5-hour-per-day extrapolation problem discussed in regard to Dr. Siegel's medical opinion, United also unreasonably infers that Laurie can work 24 hours per week because she completed a 7-hour IME. This inference is unreasonable because of the nature

of Laurie's CFS symptoms.  This inference may indeed be valid in many other contexts, but Laurie's CFS symptoms "wax and wane" and exertion on one day leads to an exacerbation of symptoms on following days.   Once more, the Plan terms do not say to divide the full-time work week into hours worked per day, and then find that the claimant is not disabled if she can work that amount on any given day.  To do so is to misinterpret the Plan terms.

Thus, to the extent United's medical consultants' Plan interpretations are inconsistent with the clear language of the Plan and to the extent United relied on its consultant misinterpretations in its own denials, United abused its discretion.

## **CONCLUSION**

The court is left with a definite and firm conviction United made a mistake in denying Laurie's claims for STD and LTD benefits.  Tempered by the low level of skepticism commensurate with United's structural conflict of interest, and weighing each of the relevant factors, this court must conclude United abused its discretion in denying Laurie's claims.  It is not possible to draw two inconsistent conclusions from the record; the only conclusion the court perceives is that Laurie has not been able to work 24 hours per week since her May 2012 CFS crash.  Concluding otherwise is not supported by substantial evidence.  Because United's denials of Laurie's STD and LTD claims were not supported by substantial evidence, it abused its discretion in denying her claims.

## **RECOMMENDATIONS**

For the reasons discussed above, Laurie's Motion for Summary Judgment (ECF #34) should be granted, and United's Motion for Summary Judgment (ECF #36) should be denied.

///

///

## <u>SCHEDULING ORDER</u>

These Findings and Recommendations will be referred to a district judge.  Objections, if

any, are due Monday, February 06, 2017.  If no objections are filed, then the Findings and

Recommendations will go under advisement on that date.  If objections are filed, then a response

is due within 14 days after being served with a copy of the objections.  When the response is due

or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED  January 23, 2017.

/s/Youlee Yim You
Youlee Yim You
United States Magistrate Judge